**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-228 (TSC)** |
| **v.** | : | |
| | : | |
| **STEPHEN ROY SEXTON,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Stephen Roy Sexton to 14 months[1] of incarceration—at the high end of the advisory Guidelines range of 8 to 14 months—followed by 24 months of supervised release. The government also requests that this Court impose 60 hours of community service, $50 special assessment, and, consistent with the plea agreement in this case, $2,000 in restitution.

## I.    Introduction

Stephen Sexton participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[2]

---

[1] Sexton pled guilty to 18 U.S.C. §§ 1361 and 1752(a)(2), which each carry a maximum term of imprisonment of 12 months. As discussed herein, the government requests that the Court impose consecutive terms of incarceration on Counts Two and Four to achieve the appropriate sentence in this case.

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

1

Sexton pleaded guilty to Destruction of Government Property, in violation of 18 U.S.C. § 1361, and Disruptive and Disorderly Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2). The government's recommended term of incarceration is supported by several factors: (1) Sexton proactively incited, encouraged, and coordinated others to travel to Washington, D.C. on January 6 prepared for violence, describing it as the initiation of an armed political conflict in the United States; (2) he prepared himself for violence that day by wearing body armor and bringing a walking stick he could use as a blunt weapon; (3) he further incited others on Capitol grounds by repeatedly yelling "We've got a breach! We need militia!" when a nearby rioter smashed a window leading into the Capitol building; (4) he broke into the Capitol building and engaged in multiple acts of property damage; and (5) he was repeatedly dishonest in statements and evidence he provided to federal investigators in this case.

The Court must also consider that Sexton's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Sexton's crimes supports a sentence of 14 months of incarceration and 24 months of supervised release.

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.    Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 42 (Statement of Offense).

### *Sexton's Conduct in Lead-Up to January 6, 2021 Attack*

In November 2020, Sexton began posting on social media that the 2020 presidential election had been stolen from then-President Donald Trump, describing the election in one Facebook post as "a political take over [of] the United States government." In late December 2020, Sexton began discussing his plans on Facebook to travel to Washington, D.C. on January 6, 2021, because Congress was set to certify the Electoral College results from the election that day. He repeatedly encouraged others to travel with him in public posts and private messages.

For example, between January 3–6, 2021, Sexton wrote "Roll Call January 6th Washington DC" in comments on several public Facebook posts on political topics, in an apparent attempt to encourage others to travel to Washington, D.C. on the day of the certification proceedings. During this period, Sexton continued to message Facebook friends encouraging them to travel to Washington, D.C., invited others to join a "caravan" to Washington, D.C., and informed others of his plans to stay in Alexandria, Virginia on the night of January 5, 2021. On the afternoon of January 5, Sexton sent a Facebook message to a group coordinating travel, sending a selfie photo of himself driving and adding the caption, "On the way see you soon."

In other Facebook messages coordinating travel to Washington, D.C., Sexton advised others to bring a "walking stick"—as Sexton himself did on January 6—implying that it could be carried without suspicion and ultimately used as a weapon. On January 4, he told one person to "crack it against the tree to make sure it's solid." Sexton also frequently compared the events

surrounding the 2020 presidential election to the start of the American Revolutionary War. For example, on January 3, 2021, Sexton wrote on Facebook: "Donald Trump is the modern-day equivalent to Paul Revere." In a private Facebook message to other individuals planning to travel to Washington, D.C. on January 6, Sexton stated, "Paul Revere the Redcoats are coming."

### *Defendant Sexton's Role in the January 6, 2021 Attack on the Capitol*

On the morning of January 6, 2021, Sexton attended President Trump's speech at the Ellipse near the White House before marching to the U.S. Capitol with others carrying a large American flag. In addition to his walking stick, Sexton wore soft body armor underneath his coat.



*Image 1: Sexton helping to carry a large American flag down Pennsylvania Avenue toward U.S. Capitol on January 6, 2021*

After entering the Capitol grounds, Sexton approached the west side of the U.S. Capitol building and reached a scaffolding platform erected in advance of the presidential inauguration planned for January 20, 2021. Sexton recorded a video of himself on this inauguration scaffolding in which he stated: "President Trump, we're here to do a wellness check." U.S. Capitol closed-caption video ("CCV") shows Sexton on this inauguration scaffolding at approximately 1:50 p.m.



*Images 2-3: Screenshots from video from Sexton's phone (left) and CCV (right) showing Sexton on the inauguration scaffolding at 1:50 p.m.*

Open-source video then captured Sexton on the Lower West Terrace outside the Capitol building, just north of an entrance to the Capitol building referred to as "the Tunnel," which at the time was being defended by U.S. Capitol Police officers against violent rioters. Sexton stood on a window ledge outside Capitol building room ST-2M. Sexton held a wooden walking stick and filmed the violence on his phone.



*Image 4: Sexton standing on a ledge on the Lower West Terrace outside room ST-2M*

Sexton remained on the Lower West Terrace until 5 p.m., over three hours after reaching the inauguration stage scaffolding. From his vantage point on the window ledge, Sexton watched and filmed rioters as they fought with police in the Tunnel who were defending access to the building. In Exhibit 1, shown in Image 5 below, Sexton yelled, "Oh shit, the motherfuckin' militia's here," and then filmed rioters pass police shields from the tunnel back into the crowd.



*Image 5: Screenshot from video recorded by Sexton on the Lower West Terrace (Ex. 1)*

As Sexton stood on the ST-2M window ledge, another rioter began to smash the glass windowpane. As the glass was being smashed, Sexton stepped up onto a platform elevating himself above those around him and yelled, "We've got a breach! We've got a breach! We need militia! Militia!"



*Image 6: Screenshot from third-party video showing Sexton yelling "We've got a breach! We need militia!" as a rioter smashed the ST-2M window (Ex. 2)*

Video footage from taken by Sexton and others shows that Sexton also entered Capitol building room ST-2M through this broken window. Third-party footage shows that Sexton committed or attempted to commit multiple acts of property damage while in ST-2M. Sexton can be seen in the corner of the room standing over an overturned wooden table. Sexton repeatedly kicked at one of the table's legs until the wood splintered. Sexton then grabbed the table leg, pried it off the table, and walked away with it.





*Images 7-8: Sexton kicking the leg off wooden table in the Capitol building (Ex. 3)*

After breaking the leg off this piece of furniture, Sexton walked back to the ST-2M window

holding his walking stick in his left hand and the table leg in his right hand.





*Images 9-10: Sexton inside room ST-2M holding a walking stick and table leg inside.*

As rioters gathered in ST-2M, several picked up a large, wooden conference table and began carrying it toward a doorway leading out of ST-2M further into the Capitol building. As rioters approached the doorway, Sexton grabbed a partially broken door and briefly attempted to pull it off its hinges.



*Image 11: Sexton attempting to pull a door off its hinges as other rioters carry a conference table through the doorway (Ex. 3)*

At approximately 5:04 p.m., law enforcement deployed tear gas or similar munitions on the Lower West Terrace outside of ST-2M and began to clear rioters from the area. Once officers

began deploying tear gas, Sexton quickly turned toward the broken window in ST-2M and climbed

out through it. He carried the table leg in his hand as he exited.



*Images 12-13: Sexton exiting ST-2M in response to police deploying smoke munitions to clear the Lower West Terrace*

Even after police cleared Sexton from the Upper West Terrace at 5 p.m.—over three hours

after he was first recorded on the inauguration scaffolding—he remained on the West Plaza. As he

filmed the destruction left by the riot, he stated: "The only reason they came back out is because

Donald Trump said we need to leave. I mean, we wouldn't have stopped, I know they wouldn't

have stopped—I mean, I didn't do anything honestly, I'm just standing here looking."



*Image 14: Screenshot from video recorded by Sexton on the West Plaza after exiting the Capitol building (Ex. 4)*

***Sexton's Statements and Activities after Capitol Riot***

On the evening of January 6, 2021, a Facebook friend asked Sexton: "Yall beating up the Antifia?" Sexton responded: "Lol it was wild," and sent the video referenced above as Image 6 in which Sexton filmed violence on the Lower West Terrace. The next day, Sexton messaged the friend: "Don't ever show anyone that again in fact erase the pictures." On January 9, Sexton messaged another Facebook friend: "I'm currently blocked on Facebook my phone was hacked last night a lot of my videos and pictures are missing."[3]

In the weeks following January 6, 2021, Sexton described the events at the Capitol as the start of a "civil war" in the United States. On January 7, a friend messaged Sexton on Facebook: "Civil war is coming … You agree?" Sexton replied: "It started yesterday where you been." On January 8, Sexton wrote on Facebook: "[O]ur country died On Wednesday." On January 10, Sexton shared a news article about the Capitol breach and wrote: "It is an official start to the Civil

---

[3] Sexton continued to use his Facebook account for several weeks after sending this message on January 9, 2021, and he still had access to videos he recorded on January 6 when he was interviewed by FBI three months later.

War." On January 11, Sexton wrote on Facebook that "The Insurrection act has been invoked" and "We are at war." That same day, Sexton shared a post from a Parler social media account impersonating President Trump, who claimed to have invoked the Insurrection Act "to address the treasonous rebellion" and that he would "remain president indefinitely until all domestic enemies are arrested."

### *Defendant's Interview with FBI*

On April 19, 2021, FBI task force officers interviewed Sexton at his residence. Sexton told the officers that he originally traveled to Washington, D.C. to sell Trump merchandise, and that he got caught up in the crowd near the Capitol that day. Sexton stated that he was in front of the Capitol building until someone broke a window, and he later entered the building by crawling through a broken window. Sexton falsely told the officers that he did not break anything inside, and that he entered the Capitol building only because he heard people screaming inside and thought they were being hurt—all of which is contradicted by the video evidence capturing Sexton that day. Sexton said, again contradicting video evidence capturing his conduct, that after he entered the Capitol to help the screaming people, he realized he did not agree with the actions of other people breaking and damaging property inside.

During his interview, Sexton informed the officers that he had pictures and video from when he was at the Capitol and was willing to send them to the officers via email. On April 22, 2021, Sexton sent four videos to the officers in an email that stated: "I heard one of the people in the room scream that they had some people trapped in another room and I did not want anyone to get hurt so I went inside the building so that I could at least prevent someone from being mobbed and at least I would be able to get video of everyone in the room."

Materials obtained from Facebook indicate that Sexton altered at least one video before providing it to officers. As shown below, the video provided by Sexton appears to show only a small portion of video's full frame, which was shown in the version Sexton uploaded to his Facebook account.[4]





*Image 15: Screenshot from Exhibit 5: Video recorded by Sexton obtained via Facebook Search Warrant*

*Image 16: Screenshot from Exhibit 6: Cropped version of Exhibit 6, which Sexton provided to the FBI*

---

[4] The cropped video appears to focus on a police officer being led through the Lower West Terrace crowd away from the tunnel. It also obscures the location of the area recorded and the size of the crowd in the inauguration staging area.

### *The Charges and Plea Agreement*

On July 12, 2023, the United States charged Sexton by eight-count Indictment with violating 18 U.S.C. §§ 1512(c)(2) (Obstruction of an Official Proceeding); 18 U.S.C. § 1361 (Destruction of Government Property); 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds); 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); 18 U.S.C. § 1752(a)(4) (Engaging in Physical Violence in a Restricted Building or Grounds); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building); 40 U.S.C. § 5104(e)(2)(F) (Act of Physical Violence in the Capitol Grounds or Buildings); 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building).

On September 11, 2024, pursuant to a plea agreement, Sexton pleaded guilty to Counts Two (18 U.S.C. § 1361)[5] and Four (18 U.S.C. § 1752(a)(2)) of the Indictment. By plea agreement, Sexton agreed to pay $2,000 in restitution to the Architect of the Capitol, which includes $1,500 for the furniture damage in room ST-2M.

### III.    Statutory Penalties

Sexton now faces a sentencing for violating 18 U.S.C. §§ 1361 and 1752(a)(2). As noted by the plea agreement and the U.S. Probation Office, he faces up to one year of imprisonment and a fine of up to $100,000 for each count. Sexton must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[5] While Sexton was charged with felony destruction of government property in violation of 18 U.S.C. § 1361, he pled guilty to the lesser-included misdemeanor offense.

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

Count Two: 18 U.S.C. § 1361

| U.S.S.G. §2B1.1(a)(2) | Base Offense Level | 6 |
| U.S.S.G. §3C1.1 | Obstruction of Justice | +2 |
| U.S.S.G. §3E1.1(a) | Acceptance of Responsibility | -2 |
| | Total: 6 | |

Count Four: 18 U.S.C. § 1752(a)(2)

| U.S.S.G. §2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. §3C1.1 | Obstruction of Justice | +2 |
| U.S.S.G. §3E1.1(a) | Acceptance of Responsibility | -2 |
| | Total: 10 | |

U.S.S.G. § 3C1.1 provides for a two-level increase in the offense level for offenders who "obstructed or impeded the administration of justice with respect to the investigation, prosecution, or sentencing . . . ." The parties and U.S. Probation Office agree that this two-level increase is warranted. Sexton obstructed the investigation by providing both false statements and altered

evidence to investigators (pp. 12–13, supra), instructing another person to delete evidence sent by Sexton (p. 11, supra), and evading the U.S. Probation Office while on release pending trial as described below in Section V.B.

U.S.S.G. § 4C1.1 provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case, because Sexton received at least one criminal history point under the Sentencing Guidelines analysis, U.S.S.G. § 4C1.1(a)(1). Additionally, the parties and U.S. Probation Office agree that § 4C1.1 does not apply because Sexton used violence or credible threats of violence against people or property, U.S.S.G. § 4C1.1(a)(3).

<u>Grouping Analysis</u>

The parties agree that Counts Two and Four form a single group because the offenses involve the same victim, Congress, and the same act or occurrence. *See* U.S.S.G. §3D1.1.  The offense level for this group is taken from Count Four because it has the highest offense level of the group: 10.

The U.S. Probation Office identified 17 past criminal convictions for Sexton, including two convictions from 2011 that each resulted in 30-day sentences of incarceration, and thus each added one criminal history point under the Sentencing Guidelines. U.S.S.G. § 4A1.1(c). The U.S. Probation Office calculated Sexton's criminal history as Category II.[6] PSR, ¶ 82. Accordingly, the U.S. Probation Office calculated Sexton's total adjusted offense level, after acceptance, at 10, and

---

[6] While the plea agreement did not identify past convictions for which criminal history points should be added, and accordingly identified Sexton's estimated Criminal History Category as I, the agreement also stated: "Your client acknowledges that after the pre-sentence investigation by the United States Probation Office, a different conclusion regarding your client's criminal convictions and/or criminal history points may be reached and your client's criminal history points may increase or decrease." ECF No. 41 at 4.

his corresponding Guidelines imprisonment range at 8 to 14 months of incarceration. PSR, ¶ 137.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

Sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of sentencing Sexton to 14 months of incarceration, followed by 24 months of supervised release.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Sexton's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

Another significant aspect of Sexton's offense is his overtly violent intent in traveling to Washington, D.C. for January 6, 2021. In describing his expectations for January 6, Sexton

invoked rhetoric calling back to the American Revolution and the Civil War. He also encouraged others to bring a sturdy walking stick—and to test it by cracking it against a tree—implying that it could be carried innocuously but used as a blunt weapon if needed. Indeed, Sexton came to the U.S. Capitol that day donned in body armor, carrying a walking stick, and prepared for violence. And it is not just Sexton's preparation and intent to participate in violence that makes Sexton's case serious, but the end goal behind it: to disrupt an important step in the nation's peaceful transfer of power that was to occur that day.

Sexton's case is also notable for his lack of candor since January 6. In the wake of January 6, Sexton took to social media to immediately recast his and other rioters' conduct as entirely peaceful, despite witnessing significant violence against officers at the Tunnel and personally engaging in multiple acts of property destruction. When Sexton spoke to the FBI, he falsely told them he went inside the Capitol building only after hearing someone yelling for help, and falsely reported that he left when he saw people damaging property. In reality, Sexton called for "militia" to alert them of a breach point by which they could enter the Capitol, and, after entering the building himself, Sexton himself damaged property.

Sexton anticipated violence, planned for violence, engaged in violence, witnessed violence, documented violence, and, despite all this, he downplayed that violence. The nature of his offense was serious, and the circumstances in which it took place—at the Capitol as Congress sought to certify a presidential election—make the offense all the more grave. There is a clear need for incarceration in this case.

### B. Sexton's History and Characteristics

Sexton is 40 years old and resides in Chapin, South Carolina. He reported a stable upbringing in a two-parent home with no abuse or neglect. With respect to his income and

occupation, Sexton reported that he owns his own business, helps with farming on his family's properties, works as a salesman at BrokerSolar, and as a server at J.R. Cash's Grill and Bar. While Sexton provided documentation verifying his income, he also reported not having paid federal income taxes since 2019.

As discussed in Sexton's Sentencing Guidelines calculations, USPO identified 17 past criminal convictions. PSR, ¶¶ 65-80. This included one conviction for receiving stolen goods, one conviction for filing a false police report, six for marijuana possession, five for fraudulent checks, two for driving under the influence, five for driving with a suspended license, and one for petty larceny. *Id*. USPO also identified eight arrests for which a conviction was either not obtained or identifiable. PSR, ¶¶ 84-92.

Moreover, Sexton engaged in a pattern of evasion with USPO after being released pending trial in this matter. He informed Probation and the Court that he was living in a trailer on his parents' property (rather than his parents' home where firearms were located), only for the Probation Officer to discover the trailer was clearly uninhabited and that Sexton appeared to be living in his parents' home. Sexton then informed Probation that he was residing at another location, only for Probation to discover that this location was also uninhabited and that Sexton was residing with his then-girlfriend. Additionally, Sexton was prohibited from possessing firearms while on pretrial release, but when his Probation Officer discovered he was residing at his parents' house, Sexton only allowed the officer to examine the basement where the gun safe was located. When the officer identified several firearms missing, Sexton was evasive about their whereabouts. Finally, just weeks ago, Sexton told Probation in the District of Columbia in a Pre-Sentence Investigation Report interview that he had not used marijuana since June 2023, when in fact Sexton

knew—and was admonished by the Court—that drug testing by Probation in South Carolina yielded positive tests for marijuana in July, August, and September 2023. PSR, ¶¶ 109, 113.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic

processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Sexton may have admitted to breaking the law in this case, and he deserves credit for his acceptance of responsibility, but that should hardly assure the Court that he will not engage in similar conduct in the future. To the contrary, there are several facts indicating that a serious term of incarceration is needed to deter Sexton from engaging in similar conduct in the future.

First, Sexton's criminal history category of II, in conjunction with his history of prior arrests and convictions, reveals an easily discernible pattern of disrespect for the law. There is a clear trend in Sexton's 25 arrests: repeated misconduct. Sexton was arrested for driving under the influence, and was caught doing it again. Sexton was arrested for possessing marijuana, and was caught doing so five more times. Arrested for writing fraudulent checks—caught four more times. This pattern of behavior should give the Court serious concerns about Sexton's risk of recidivism.

Second, although Sexton has accepted responsibility in pleading guilty, his post-January 6 conduct and statements are deeply troubling. Sexton downplayed and outright lied about the violence he saw and participated in that day, both on social media and in statements to the FBI. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions."). There is little indication that Sexton appreciates the harm that his conduct caused, or that it would cause if repeated in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors to assault on police officers.[7] This Court must sentence Sexton based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Sexton has pleaded guilty to two Class A misdemeanors: 18 U.S.C. §§ 1361 and 1752(a)(2). The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Cronin*, 22-cr-233 (ABJ), the Court sentenced the defendant to 8 months' incarceration. Like Sexton, Cronin pleaded guilty to a misdemeanor charge of 18 U.S.C. § 1361. Unlike Sexton who also pleaded guilty to a misdemeanor charge of 18 U.S.C. § 1752(a)(2), Cronin pleaded guilty to 18 U.S.C. § 1752(a)(1), which has a lower guidelines range. Ultimately, however, Sexton and Cronin had the same total estimated offense level because Cronin

---

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

agreed to an enhancement under U.S.S.G. § 2B1.5(b)(2) for destruction of property occurring at a national historical landmark. While Sexton and Cronin observed and filmed violence on January 6, 2021, only Sexton pre-planned and coordinated in advance of January 6, 2021, including describing the 2020 election as a "a political take over [of] the United States government," discussing plans to travel to Washington, D.C. in anticipation of the certification of the Electoral College vote, encouraging others to travel to Washington, D.C. in light of the certification, and disseminating advice on arming oneself with objects that could be used as weapons, *i.e.* a walking stick, that could slip past authorities undetected. Moreover, unlike Cronin, Sexton obstructed justice during the investigation into his conduct. Consequently, Sexton deserves a harsher punishment than Cronin.

In *United States v. Calhoun*, 21-cr-116 (DLF), the Court sentenced the defendant to 18 months' incarceration. Like Sexton, Calhoun took to social media before January 6, describing that day in terms of war and revolution and discussing weapons that might be allowed in Washington, D.C. And, like Sexton, Calhoun posted on social media throughout the day on January 6, describing the skirmishes on Capitol grounds and celebrating the "hostile takeover" of the Capitol. Just as Sexton's social media activity following January 6 contemplated "Civil War," "rebellion," and hopes that the then-President would "remain president indefinitely until all domestic enemies are arrested," Calhoun stated after January 6 that "somebody had to do it . . . ." Calhoun took his case to trial, where he testified falsely. While Sexton receives some credit for acceptance of responsibility, he similarly obstructed justice. Moreover, while *Calhoun* involved a pre-*Fischer* conviction under 18 U.S.C. §1512(c)(2)—and therefore a higher guidelines calculation than the present case—the defendant's *conduct* was substantially similar to Sexton's offense conduct, making it an appropriate comparator under § 3553(a)(6). Indeed, this case

demonstrates that the government's recommended sentence of 14 months would not create an unwarranted sentencing disparity despite the government's intent to dismiss the 18 U.S.C. §1512(c)(2) charge here.

Finally, in *United States v. Ehmke*, 22-cr-29 (TSC), this Court sentenced the defendant to 4 months' incarceration. The defendant pleaded guilty to a felony charge of 18 U.S.C. § 1361 for breaking windows. However, Sexton's conduct was more egregious. First, Ehmke did not enter the U.S. Capitol Building. Second, while Sexton obstructed justice as described above, Ehmke did not. Third, unlike Sexton, Ehmke did not engage in pre-planning and coordinating in advance of January 6, 2021 to disrupt the certification of the Electoral College vote. Indeed, Ehmke's total estimated offense level was 6, versus Sexton's agreed upon offense level of 10. Given Sexton's greater quantitative total estimated offense level and qualitatively worse offense conduct, Sexton deserves a substantially harsher punishment.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Consecutive Sentences

The government's requests that the Court sentence Sexton to a term of 14 months' incarceration requires partially consecutive sentences on Counts Two and Four. A federal court "can typically choose whether to run" a defendant's "sentences concurrently or consecutively." *Lora v. United States*, 599 U.S. 453, 455 (2023); *see also Setser v. United States*, 566 U.S. 231, 236 (2012) ("Judges have long been understood to have discretion to select whether the sentences they impose will run concurrently or consecutively with respect to other sentences that they impose . . ."). While the Sentencing Guidelines' default position is that sentences of imprisonment run concurrently, "if the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts *shall* run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment." U.S.S.G. § 5G1.2(d) (emphasis added); *see also United States v. Lafayette,* 337 F.3d 1043, 1050 & n.11 (D.C. Cir. 2003) (explaining that a court may impose consecutive or "stack[ed]" sentences to achieve a total sentence in excess of the statutory maximum on a single count).

Moreover, "although the Guidelines should be the starting point and the initial benchmark, district courts may impose sentences within statutory limits based on appropriate consideration of all of the factors listed in § 3553(a)." *Pepper v. United States*, 562 U.S. 476, 490 (2011). Specifically, 18 U.S.C. § 3584(a) provides that "[i]f multiple terms of imprisonment are imposed on a defendant at the same time . . . the terms may run concurrently or consecutively," while Section 3584(b) states that "[t]he court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in [18 U.S.C.] section 3553(a)." District

Courts thus have discretion to deviate "from the guidelines' recommendation that a defendant's sentences run concurrently and to impose, instead, consecutive sentences after considering the § 3553(a) factors." *United States v. Lymon*, 905 F.3d 1149, 1153 (10th Cir. 2018).

The government is aware of at least two January 6 cases where the Court imposed consecutive sentences of incarceration. *See United States v. Nordean, et. al*, 21-cr-175 (TJK), Sep. 5, 2023 Minute Entry; *United States v. Neely*, 21-cr-0642 (JDB) Sep. 5, 2023 Set. Hrg. Tr. at 42; *see also United States v. Kelly*, 21-cr-708 (RCL), ECF No. 147 at 10 ("The Court is much likelier to impose a sentence of at least 12 months, and perhaps greater if the Court decides to impose any sentences consecutively. The Court is likely to impose such a sentence even if it requires an upward variance from the guidelines.").

As discussed above, the § 3553(a) factors counsel that Sexton be sentenced to a term of incarceration above the statutory maximum sentence. His sentences of incarceration should run consecutively on Count Two and Four to the extent necessary to achieve that sentence.

### VII.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Sexton must pay $2,000 in restitution. This includes $500 that reflects in part the role Sexton played in the riot on January 6, plus an additional $1,500 to fully reflect the damage Sexton did in room ST-2M.[9] ECF No 41 (Plea Agreement), ¶ 41. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Sexton's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 45.

## VIII.   Fine

Sexton's convictions for violations of 18 U.S.C. §§ 1361 and 1752(a)(2) subject him to a statutory maximum fine of $100,000 for each count. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The

---

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Sexton's financial assets set forth in the PSR suggest that he is unable, and is unlikely to become able, to pay a fine.

## IX.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Sexton to 14 months of incarceration, 24 months of supervised release, 60 hours of community service, a $50 special assessment, and $2,000 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Sexton's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crimes.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Hutton Marshall*
JOSEPH HUTTON MARSHALL
PAVAN KRISHNAMURTHY
Assistant U.S. Attorneys
U.S. Attorney's Office for the
District of Columbia
DC Bar No. 1721890
601 D Street N.W.
Washington, D.C. 20579
(202) 809-2166
Joseph.hutton.marshall@usdoj.gov