UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Cr. No.: 1:23CR00228-TSC |
| | ) |
| | ) |
| vs. | ) |
| | ) **SENTENCING MEMORANDUM** |
| | ) **IN SUPPORT OF** |
| **STEPHEN ROY SEXTON** | ) **DOWNWARD VARIANCE** |
| | ) |
| Defendant. | ) |
| | ) |

PLEASE TAKE NOTICE that the above-named defendant, by and through undersigned counsel**,** hereby moves this Honorable Court to impose a sentence that is less severe than the sentencing range called for by the advisory sentencing guidelines.  Currently, Mr. Sexton's advisory sentencing range is 8 to 14 months.  This range is based on a total offense level of 10 and a criminal history category of II.

In support of this motion, this defendant offers the following:

Defendant Stephen Sexton was 36 years old when the Capitol riot occurred on January 6, 2021.  Leading up to January 6, Mr. Sexton was following the nonstop media coverage surrounding the controversial and polarizing 2020 presidential election.  Media reports—and then-President Trump's own Twitter feed—led him to believe the election had been "stolen" from Trump.  When the President staged a rally to protest the election results, Mr. Sexton wanted to attend and so he traveled to Washington, D.C., alone. On January 6, Mr. Sexton attended President Trump's rally at the Ellipse.  From there, Mr. Sexton walked to the U.S. Capitol with other individuals in the crowd, which he did not know, carrying a large American Flag. Once he reached the United States Capitol Building, Mr. Sexton engaged in conduct that he will forever regret.

Mr. Sexton is a relatively young man from a simple background who made incredibly poor decisions on January 6, 2021. On Monday, December 16, 2024, he will stand before this Court facing the stark prospect of imprisonment, isolated from his local community and elderly, loving parents and their family farm. Mr. Sexton knows he must be punished, but submits that a sentence within the current advisory range of 8-14 months imprisonment is unduly severe. His bond compliance, background, and specific conduct on January 6 all justify a lower sentence.

When comparing Mr. Sexton's case with other January 6 cases, and when applying the other § 3553(a) sentencing factors, it is clear a lengthy prison sentence does not accomplish the true goals of federal sentencing. Mr. Sexton respectfully asks this Court to vary downward and impose a sentence of probation, with whatever additional conditions the Court deems to be appropriate.

## ADVISORY GUIDELINES AND SENTENCING FACTORS

"There is a longstanding tradition in American law, dating back to the dawn of the Republic, that a judge at sentencing considers the whole person before him or her as an individual." *Concepcion v. United States*, 597 U.S. 481, 486 (2022) (internal quotation marks omitted). "Congress has instructed sentencing courts to impose sentences that are sufficient, but not greater than necessary, to comply with (among other things) certain basic objectives, including the need for just punishment, deterrence, protection of the public, and rehabilitation.*" Holguin-Hernandez v. United States*, 140 S. Ct. 762, 765–66 (2020) (cleaned up).

A sentencing proceeding begins with a correct calculation of the applicable Sentencing Guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007). However, the Guidelines are only the "starting point"; they are "advisory only." *Hughes v. United States*, 584 U.S. 675, 681, 686 (2018). A court "may not presume that the Guidelines range is reasonable"; it "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. A court must

consider not only the Guidelines but also all other statutory sentencing factors outlined in 18 U.S.C.

§ 3553(a).  *Chavez-Meza v. United States*, 138 S. Ct. 1959, 1963 (2018). The sentencing guidelines

have been advisory since January 2005 when the United States Supreme Court decided *United*

*States v. Booker*, 125 S. Ct. 738 (2005).   Now, all federal district courts must follow the dictates of

18 U.S.C. § 3553(a) which requires that:

(a) Factors to be considered in imposing a sentence.–The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.  The court, in determining the particular sentence to be imposed, shall consider–

(1) the nature and circumstance of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed:

(A)    to reflect the seriousness of the offense, to promote respect of the law,  and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes to the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for–

(A)    the applicable category of offense committed by the applicable category of  defendant as set forth in the guidelines–

(i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28; and

(ii) that, except as provided in section 3742(g), are in effect on  the

date the defendant is sentenced; or

    (B)    in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28;

(5) any pertinent policy statement-

    (A)    issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by acts of Congress (regardless of whether such amendments issued under section 994(p) of title 28; and

    (B)    that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

This "list of factors is preceded by what is known as the parsimony principle, a broad command that instructs courts to 'impose a sentence sufficient, but not greater than necessary, to comply with' the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Dean v. United States*, 581 U.S. 62, 67 (2017) (quoting 18 U.S.C. § 3553(a)). The statutory directive in the parsimony clause represents the "overarching" command of the statute. *Kimbrough v. United States*, 552 U.S. 85, 111 (2007).

## 18 U.S.C. § 3553(a) FACTORS

### I.    Nature And Circumstance Of The Offense

Mr. Sexton pled guilty to two misdemeanor counts: specifically he pled to guilty to one count of destruction of government property ($1,000 or less), in violation of 18 U.S.C. § 1361; and

one count of disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2). ECF No. 41. He also signed a Statement of Offense admitting to the actions he committed at the United States Capitol Building on January 6, 2021. ECF No. 42. Mr. Sexton has admitted that he damaged a small end table, which was the property of the Government, and tried to push open an already damaged door which was off at least one hinge as rioters attempted to carry a full size conference table through the door. When Mr. Sexton entered Room ST-2M, through a window that was broken by other individuals, there were already over 15 people inside, furniture was already overturned and strewn about, and individuals had already broken off other table legs. The table Mr. Sexton has admitted to damaging was overturned when he broke a leg off of it. Mr. Sexton never left ST-2M and was inside this room for approximately 12 minutes total. His entry was at approximately 4:50 p.m., well after all members of the House of Representatives and the Senate had already evacuated the Chambers, and after all proceedings of the United States Congress, including the joint session had been effectively suspended. He never proceeded any further into the Capitol than ST-2M. Once he left that room, he continued on to leave the Capitol grounds and to leave Washington, D.C. completely.

Mr. Sexton knows his conduct was unacceptable. He has accepted responsibility for his actions and knows he must accept the consequences for them. It is clear that he broke the law, and he is not trying to avoid responsibility for that. He does ask that the Court consider that he did not plan the unlawful conduct he engaged in before January 6, nor was he involved in any planning or leadership of what occurred that day. He never devised to go to the Capitol Building and grounds. He did not go to Washington, D.C. intending to hurt anyone or damage anything. He went to attend a rally at the Ellipse. But then he, like so many others attending the rally, walked towards the Capitol and became involved in the amplifying chaos. His subsequent actions were impetuous and

wrong.  While his actions were completely unjustifiable, Mr. Sexton did not engage in the degree of extreme violence that many other rioters did.  He did not assault any police officers or even interact with law enforcement.

Mr. Sexton knows his actions on January 6 were illegal, indefensible, and intolerable.  He recognizes his misconduct on January 6 had serious consequences for the law enforcement officers protecting the Capitol Building, the structure's physical integrity, and the democratic process occurring that day.  His actions have also devastated those who love him most: his family, especially his parents. Mr. Sexton is sincerely remorseful for his conduct and the part he played in the January 6 events.

## II.    Mr. Sexton's History and Characteristics

Mr. Sexton's parents are both United States Army veterans, and his brother is currently in the United States Navy, stationed in Japan. He had a good childhood and began to work on the maternal family farm at an early age. He participated in the Boy Scouts of America growing up. In his early teen years, he went to live with his grandmother so he would have the opportunity to attend better schools.

Mr. Sexton ultimately graduated from Colonial Christian Academy in 2003. He attended some classes at two technical schools, but was not able to earn a degree. He is a self-taught computer numerical control machinist and prior to January 6, had operated his own business traveling to bike rallies and trade shoes where he has sold custom knives and leather goods.

Mr. Sexton attends religious services at Elevation Christian Church.

Mr. Sexton has no prior felony convictions, and compared to a great many defendants who encounter federal prosecution and unlike many January 6 participants, he lacks a significant serious criminal record.  He has no prior criminal convictions for any acts of violence. After some initial

struggles, he remained in compliance with his bond conditions.  In fact, Mr. Sexton's pretrial supervision has had a positive impact on his lifestyle, both professionally and personally.

Mr. Sexton's guidelines range of 8-14 months is based on a total offense level of 10 and a criminal history category of II. The parties had anticipated in the plea agreement that Mr. Sexton would be in a criminal history category of I. Mr. Sexton asks that the Court consider a one level variance of at least one criminal history category pursuant to the commentary to U.S.S.G. §4A1.3, prior to the consideration of the 18 USC 3553(a) factors.

In support of this request, this defendant offers the following:

Section 4A1.3(b) contemplates possible departures based on the substantial overrepresentation of a defendant's criminal history category. The Commentary, and specifically application note 3(A)(ii) provides as follows:

3. Downward Departures.

(A)    Examples.--A downward departure from the defendant's criminal history category may be warranted based on any of the following circumstances:

    (i)    The Defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period.

    (ii)    The defendant received criminal history points from a sentence for possession of marihuana for personal use, without an intent to sell or distribute it to another person.[1]

---

[1] By way of background, on November 1, 2023, Part C of the Amendments revised the Commentary to §4A1.3 (Departures Based on Inadequacy of Criminal History Category (Policy Statements)) to include sentences resulting from possession of marijuana offenses as an example of when a downward departure from the defendant's criminal history may be warranted. Specifically, Part C provided that a downward departure may be warranted if the

This recently added commentary supports a downward variance of one criminal history category for Mr. Sexton. Mr. Sexton received a criminal history point in ¶ 80 for a simple possession of Marijuana offense on May 3, 2011. He received another criminal history point in ¶ 81 also for simple possession of marijuana on September 21, 2011. Both of the criminal history points assessed in his Presentence Investigation Report are for misdemeanor simple possession of marijuana offenses from 2011, approximately 10 years before the criminal conduct in the instant case. If sentenced without these 1-point marijuana possession convictions, Mr. Sexton's Criminal History Points would be reduced from 2-points to 0-points, resulting in a lowered criminal history category from II to I.   The resulting guidelines would be 6-12 months based on a total offense level of 10 and a criminal history category of I.[2] This would put Mr. Sexton in the guideline range contemplated by

defendant received criminal history points for a sentence for possession of marijuana for personal use, without an intent to sell or distribute to another person.  See also U.S. SENT'G COMM'N, WEIGHING THE IMPACT OF SIMPLE POSSESSION OF MARIJUANA: TRENDS AND SENTENCING IN THE FEDERAL SYSTEM (2023), available at https://www.ussc.gov/research/research-reports/weighing-impact-simple-possession-marijuana.  Briefly, some of the key findings of the cited Commission Report, which in part examines how prior sentences for simple possession of marijuana (under both federal and state law) affect criminal history calculations under the federal sentencing guidelines for new federal offenses, are as follows: (1) In fiscal year 2021, 4,405 federal offenders (8.0%) received criminal history points under the federal sentencing guidelines for prior marijuana possession sentences. Most of the prior sentences (79.3%) were for less than 60 days in prison, including non-custodial sentences. Furthermore, ten percent (10.2%) of these 4,405 offenders had no other criminal history points; (2) The criminal history points assigned under the federal sentencing guidelines for prior marijuana possession sentences resulted in a higher criminal history category for 1,765 of the 4,405 offenders (40.1%); (3) Of the 1,765 offenders whose criminal history category was impacted by a prior marijuana possession sentence, most were male (94.2%), U.S. citizens (80.0%), and either Black (41.7%) or Hispanic (40.1%); and (4) Nearly all (97.0%) of the prior marijuana possession sentences were for state convictions, some of which were from states that have changed their laws to decriminalize (22.2%) or legalize (18.2%) marijuana possession, states that allow for expungement or sealing of marijuana possession records (19.7%), or some combination thereof. Prior sentences for marijuana possession from these states resulted in higher criminal history calculations under the federal sentencing guidelines for 695 offenders.
*See Id*.
[2] The result would be the same if either of the convictions was not counted.

the parties in his plea agreement.

### III. Need To Reflect The Seriousness Of The Offense, To Promote Respect Of The Law, And To Provide Just Punishment For The Offense

In this case, a sentence of probation promotes respect for the law in several meaningful ways. For one, it acknowledges that Mr. Sexton, who is now forty years old, has not engaged in any serious felonious criminal activity up until this incident. As well, it acknowledges that Mr. Sexton demonstrated respect for the law by accepting responsibility via his timely plea agreement with the Government.

When a person's circumstances or the nature of his offense warrant leniency, a sentence of probation can promote greater respect for the law than would be achieved by a prison sentence. As the Supreme Court explained in *Gall*, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *See Gall v. United States*, 552 U.S. 38, 48, 54 (2007) (quoting district court opinion with approval). The district court in *Gall* did "tak[e] into account the real conduct and circumstances" of the defendant and varied from an advisory guideline range of 30 to 37 months imprisonment to a sentence of 36 months' probation. *Id*. at 593. In upholding the probation sentence, the Supreme Court explained that the district court had reached a "reasoned and reasonable decision that the § 3553(a) factors, on the whole, justified the sentence [of probation]." *Id*. at 602. Probation substantially restricts a person's liberty and thus constitutes a serious and meaningful consequence to criminal conduct. *See Gall*, 552 U.S. at 48. "Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony[,] refrain from excessive drinking" and

comply with other special conditions like drug testing or participation in drug treatment. *Id.* (citing U.S.S.G. § 5B1.3). A sentence of probation is sufficient to signal to the public that such actions as contained in this case can result in serious restrictions on one's liberty, while also being adequate to deter Mr. Sexton from any future crimes.

**IV.    Need To Afford Adequate Deterrence To Criminal Conduct;**

A sentence of probation would adequately serve as both a specific and general deterrence from additional criminal conduct, in accordance with 18 U.S.C § 3553(a)(2)(B). Those thinking of participating in another subversive event like January 6, now understand they will come away from that participation with a criminal record, a humiliating arrest process, and be forever lumped into the "mob" behavior featured on the daily news.

As to deterrence specific to Mr. Sexton, his arrest and participation in the court process itself has been enough to deter him from ever committing another unlawful act. For well over a year now, Mr. Sexton has been punished for his actions on January 6. He lives in abject terror about the prospect of going to prison. Mr. Sexton does not need a period of incarceration to deter him from future criminal conduct. His previous interactions with the Court system have all been with magistrate or municipal level courts for which he primarily paid fines and court costs. Both of his criminal history points come from simple possession of marijuana convictions.

After his arrest in the instant case, Mr. Sexton was released on an unsecured bond. After a few initial issues, Mr. Sexton has complied with his conditions of release with no problems for over 17 months now.

Mr. Sexton is currently employed as a server in a restaurant. He has maintained employment during his release on bond, and will be employed at the time of the sentencing hearing.

Additionally, he has some very promising prospects related to his family's farm property and solar energy opportunities.

Mr. Sexton recognizes, of course, that this Court must consider general deterrence. But, even there, the sentence need not be lengthy or contain actual incarceration to provide a deterrent effect. A below-guideline sentence will still have a strong general deterrent effect. "Under the theory of general deterrence, the government essentially seeks to make an example of an offender through punishing him so that other potential offenders are intimidated into refraining from committing the contemplated crime." *United States v. Slatten*, 865 F.3d 767, 819 (D.C. Cir. 2017).

"In terms of both specific and general deterrence, there is overwhelming evidence in the scientific literature that 'the *certainty* of being caught is a vastly more powerful deterrent than the severity of the punishment.'" *United States v. Browning*, 2021 WL 795725, at *5 (E.D. Mich. Mar. 2, 2021) (brackets omitted) (quoting U.S. Dep't of Justice, Nat'l Inst. Just., Five Things about Deterrence 1 (2016), *available at* https://www.ojp.gov/pdffiles1/nij/247350.pdf (last visited Dec. 9, 2024)).

> *Severity* refers to the length of a sentence. Studies show that for most individuals convicted of a crime, short to moderate prison sentences may be a deterrent but longer prison terms produce only a limited deterrent effect.
>
> *Certainty* refers to the likelihood of being caught and punished for the commission of a crime. Research underscores the more significant role that certainty plays in deterrence than severity—it is the certainty of being caught that deters a person from committing crime, not the fear of being punished or the severity of the punishment. Effective policing that leads to swift and certain (but not necessarily severe) sanctions is a better deterrent than the threat of incarceration. In addition, there is no evidence that the deterrent effect increases when the likelihood of conviction increases. Nor is there any evidence that the deterrent effect increases when the likelihood of imprisonment increases.
>
> *Id*. (ellipsis omitted).

## V.     Need To Protect The Public From Further Crimes To The Defendant And For Rehabilitation

A probationary sentence in this case will protect the public.  Mr. Sexton's offenses occurred at a large political rally where he was surrounded by people who were also committing criminal offenses.  Mr. Sexton did not plan the Capitol riot and traveled to Washington, D.C. alone. He did not come to fisticuffs with any law enforcement officers.  Multiple factors demonstrate Mr. Sexton will not reoffend.  Since he was released in July 2023, Mr. Sexton has shown over a substantial period of time that he can conform his conduct to societal norms—and meaningfully contribute to society.  While he struggled initially with marijuana usage, he completely stopped that usage within two months of being placed on bond. Indeed, his conduct on bond has been commendable.

Mr. Sexton does not possess a criminal history that suggests a lengthy custody sentence is necessary to protect the public.  He has vocational skills and a strong work ethic. He has addressed and tackled his issues with marijuana usage, and has no other substance abuse problems.  His stable family and loving parents will be there to provide support for him; and they already need his support. Mr. Sexton can and will maintain stable employment.

## VI.     Kinds Of Sentences, The Guideline Range, And Policy Statement

The PSR correctly calculates an advisory Guideline range of 8 to 14 months' imprisonment. However, a sentencing court cannot "presume that a sentence within the applicable Guidelines range is reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam).  "The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Id*.

Mr. Sexton's guideline range falls in Zone B of the Sentencing Table. Accordingly, the minimum term may be satisfied by (1) a sentence of imprisonment; (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement

or home detention according to the schedule in USSG § 5C1.1(c), provided that at least one month

is satisfied by imprisonment, or (3) a sentence of probation that includes a condition of combination

of conditions that substitute intermittent confinement, community confinement or home detention

for imprisonment according to the schedule in U.S.S.G. §5C1.1(c) For many of the same reasons

discussed above, Mr. Sexton implores this Court to impose a sentence of probation, with whatever

additional conditions the Court seems fit, as specifically contemplated by the Guidelines.

### VII.    Need to Avoid Sentencing Disparities

Courts sentencing January 6 defendants "must consider 'the need to avoid unwarranted

sentence disparities among defendants with similar records who have been found guilty of similar

conduct.'"  *United States v. Webster*, 102 F.4th 471, 490 (D.C. Cir. 2024) (quoting 18 U.S.C. §

3553(a)(6)).  It is equally important to consider the sentences of defendants who went to trial versus

sentences of those who pled guilty.

A non-custodial sentence for Mr. Sexton would not create any unwarranted disparities

among cases with similar facts.

This Court should compare Mr. Sexton's case with other similarly January 6 cases involving

an 18 USC § 1752(a)(2) conviction and/or a Misdemeanor 18 USC § 1361 conviction, paired with

other misdemeanor convictions.

- ◼ 1:23-CR-00066-ZMF U.S. v. Rebecca Lavrenz: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G).  She was sentenced to 1 year of probation, $103,000 fine, $500 in restitution

- ◼ 1:24-CR-00017-APM U.S. v. Jonathan Bonney: Defendant pled guilty to one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C.

§ 5104(e)(2)(G).  He was sentenced to 12 months probation, 60 hours community service, $70 fine, and $500 in restitution.

- 1:23-cr-321-JEB US v. James Ray Epps, Sr.: Defendant pled guilty to one count of 18 U.S.C. 18 U.S.C. § 1752(a)(2).  He was sentenced to 12 months probation and $500 in restitution. Mr. Epps, Sr. (a farmer like Mr. Sexton) inspired and gathered a crowd to storm the Capitol, was present while rioters overwhelmed police at three key breach points, pushed a large metal-framed sign into a group of police officers holding a defensive line, and participated in a scrum-like effort to push past that police line.

- 1:21-CR-00136-RC U.S. v. Felipe Marquez: Defendant pled guilty to one count of 18 U.S.C. § 1752(a)(2). He was sentenced to 18 months probation, with 3 months of home detention and $500 in restitution

- 1:22-CR-00099-RJL U.S. v. Jack Maxwell: Defendant was convicted of one count each of 18 U.S.C. § 231(a)(3); 18 U.S.C. § 1752(a)(1); and 18 U.S.C. § 1752(a)(2).  He was sentenced to 18 months probation, with 6 months home detention, and $1500 in restitution. This Defendant was present at the forefront of the violent mob on the West Plaza, had his physical encounters with multiple law enforcement officers, and remained on Capitol grounds observing violence for a lengthy period of time and gave materially false testimony at trial on this conduct

- 1:21-CR-00156-JDB U.S. v. Stephen Ayres: Defendant pled guilty to one count of 18 U.S.C. § 1752(a)(2). He received a sentence of 24 months probation, 100 hours of community service, and $500 in restitution.

- 1:24-CR-00172-APM U.S v. Edward Amyot: Defendant pled guilty to one count of 18 U.S.C. § 1752(a)(2).  He was sentenced to 24 months probation, 60 days home detention,

60 hours community service, $5,000 fine, and $500 in restitution

- 1:24-CR-00172-APM U.S. v. Dominic Jakubowski: Defendant pled guilty to one count of 18 U.S.C. § 1752(a)(2). He was sentenced to 24 months probation, 60 days home detention, 60 hours community service, $5,000 fine, and $500 in restitution

- 1:21-CR-00519-TFH U.S. v. Steven Billingsley: Defendant pled guilty to one count of 18 U.S.C. § 1752(a)(2). He was sentenced to 24 months probation, 60 hours community service and $500 in restitution.

- 1:22-CR-00027-RMM U.S. v. Tyler Tew: Defendant pled guilty to one count each of 18 U.S.C. 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 24 months probation, $2,000 fine, and $500 in restitution

- 1:23-CR-00050-JMC U.S. v. Dillon Homol: Defendant was convicted of one count each of 18 U.S.C. 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 24 months probation, 90 days home detention, 40 hours community service, $4,000 fine, and $500 in restitution

- 1:23-CR-0143-APM U.S. v. Michael Daniele: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 24 months' probation, 30 days' home incarceration, $2,500 fine, and $500 in restitution

- 1:23-CR-00180-TNM U.S. v. Tyler Bensch: Defendant pled guilty to one count each of 18 U.S.C. 1752(a)(2) and 18 U.S.C. § 641. He was sentenced to 24 months of probation, with 60 days home detention, 60 hours community service, and $500 in restitution. This defendant (1) Bensch traveled to Washington, D.C. prior to January 6th with a militia group

the "Three Percenters" aware of the possibility of violence; (2) Bensch wore a gas mask, tactical vest loaded with a chemical irritant spray, military attire, a helmet, and goggles to the United States Capitol indicating that he was prepared for violence; (3) the defendant saw violence prior to joining a group of rioters moving toward the Lower West Terrace Tunnel ("the Tunnel"); (4) upon arrival at the Tunnel, Bensch saw rioters throwing heavy objects into the Tunnel in an attack against police officers holding the line at the entry point to the Capitol erected in preparation for the Presidential Inauguration; (5) Bensch walked away from the violent scene at the U.S. Capitol with a stolen police shield; (6) and Bensch has shown little, if any, remorse for his action.

- 1:21-CR-00393-RDM U.S. v. Hunter Palm: Defendant pled guilty to one count of 18 U.S.C. § 1752(a)(2). He was sentenced to 36 months probation, 100 hours community service, and $500 in restitution

- 1:23-CR-00369-JMC U.S. v. William F. Beals, II: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1) and 18 U.S.C. § 1752(a)(2). He was sentenced to 36 months probation, 90 days home detention, 75 hours community service and $500 in restitution

- 1:21-CR-00279-DLF U.S. v. Ethan Seitz: Defendant was convicted of one count of 18 U.S.C. § 1752(a)(2). He was sentenced to 36 months probation, 60 days home detention, and $500 in restitution. This Defendant grabbed a law enforcement baton at one point.

- 1:21-CR-00536-ACR U.S. v. Karol Chwiesiuk: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). She was sentenced to 36 months probation, 90 days home detention, 200 hours community service, and $500 in restitution

- 1:21-CR-00536-ACR U.S. v. Agnieszka Chwiesiuk: Defendant was convicted of one count

each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 36 months probation, 90 days home detention, 200 hours community service, and $500 in restitution

- 1:22-CR-00089-ZMF U.S. v. Nancy Barron: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). She was sentenced 36 months probation, 180 days home detention, and $500 in restitution

- 1:23-CR-00362-TNM U.S. v. Joshua Coker: Defendant pled guilty to one count of 18 U.S.C. § 1752(a)(2). He was sentenced to 36 months probation and 8 months home detention

- 1:21-CR-00223-APM U.S. v. Matthew Wood:  Defendant pled guilty to one count each of 18 U.S.C. § 1512(c)(2) and 2; 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(C); 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). Defendant was sentenced to 36 months probation, 12 months home detention, 100 hours community service and $2,000 in restitution.

- 1:21-CR-00575-JDB U.S. v. James Cusick, Jr.: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 10 days incarceration, 24 months supervised release, 50 hours community service, $3,000 fine, and $500 in restitution

- 1:21-CR-00575-JDB U.S. v. Casey Cusick: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 10 days incarceration, 24 months supervised release, 50 hours community service, $3,000 fine, and $500 in restitution

- 1:21-CR-00575-JDB U.S. v. David Lesperance: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 10 days incarceration, 24 months supervised release, 50 hours community service, $3,000 fine, and $500 in restitution

- 1:23-CR-00009-CJN U.S. v. Gabriel Brown: Defendant pled guilty to one count each of 18 U.S.C.§ 1752(a)(2) and 40 U.S.C.§ 5104(e)(2)(F). He was sentenced to 20 days incarceration, 12 months supervised release, 60 hours community service, and $500 in restitution

- 1:21-CR-00734-JEB U.S. v. Lawrence Dropkin: Defendant pled guilty to one count of 18 U.S.C. § 1752(a)(1); one count of 18 U.S.C. § 1752(a)(2); one count of 40 U.S.C. § 5104(e)(2)(D); and one count of 40 U.S.C. § 5104(e)(2)(G). He received a sentence of 30 days incarceration, 12 months supervised release, 60 hours community service, and $500 in restitution.

- 1:23-CR-00375-CRC U.S. v. Elliott Williams: Defendant pled guilty to one count of 18 U.S.C. § 1752(a)(2). He was sentenced to 30 days incarceration, 12 months supervised release, 50 hours community service, and $500 in restitution

- 1:21-CR-00161-RBW U.S. v. Robert Lyon: Defendant pled guilty to one count of 18 U.S.C. § 1752(a)(2); one count of 18 U.S.C. § 641 and 2. He received a sentence of 40 days incarceration, 12 months supervised release, a $1,000 fine, and $2,000 in restitution.

- 1:21-CR-00050-CRC U.S. v. Katherine Schwab: Defendant pled guilty to one count of 18 U.S.C. § 1752(a)(2). She was sentenced to 45 days incarceration, 12 months supervised release and $500 in restitution.

- 1:21-CR-00585-CRC U.S. v. James Rahm, III: Defendant pled guilty to one count of 18

U.S.C. § 1752(a)(2). He was sentenced to 45 days incarceration, 12 months supervised release, and $500 in restitution. James Rahm spent more than 45 minutes inside the Capitol. He videotaped his descent on the Capitol, recording an injured police officer being helped by other officers and himself declaring, "We just stormed the Capitol." Rahm joined the crowd that pushed against and surged past police officers trying to hold back rioters in the Crypt, as well as another crowd that pushed three police officers into the East Rotunda Doors, enabling hundreds of rioters to enter the Capitol. He entered and filmed Speaker Nancy Pelosi's office suite, and he smoked marijuana in the Rotunda.

- 1:21-CR-00719-JEB U.S. v. Christopher Price: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 45 days incarceration, 9 months supervised release, and $500 in restitution

- 1:22-CR-00040-JEB: U.S. v. Sandra Weyer: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). She was sentenced to 12 months supervised release (credit time served approximately 2 months); 240 hours community service and $500 in restitution.

- 1:22-CR-00038-BAH U.S. v. Jolen Eicher: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). She was sentenced to 2 months incarceration, 12 months supervised release, and $500 in restitution

- 1:23-CR-00279-RCL U.S. v. Thomas Riddle: Defendant plea guilty to one count of 18 U.S.C. § 1752(a)(2). He was sentenced to 60 days incarceration, 12 months supervised release, and $500 in restitution

- 1:23-CR-00294-RCL U.S. v. Kevin Clardy: Defendant pled guilty to one count of 18 U.S.C. § 1752(a)(2). He was sentenced to 60 days incarceration, 12 months supervised release, and $500 in restitution

- 1:21-CR-00317-TSC U.S. v. Benjamin Larocca: Defendant pled guilty to one count of 18 U.S.C. § 1752(a)(2). He was sentenced to 60 days incarceration, 12 months supervised release, 60 hours of community service, $2,000 fine and $500 in restitution

- 1:21-CR-00250-PLF U.S. v. Phillip Bromley: Defendant pled guilty to one count of 18 U.S.C. § 1752(a)(2). He was sentenced to 3 months incarceration, 12 months supervised release, a $2,000 fine and $2,000 in restitution.

- 1:21-CR-00668-TNM U.S. v. Mick Chan: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); and 40 U.S.C. § 5104(E)(2)(G). He was sentenced to 3 months incarceration, 5 months home detention, 12 months supervised release, 60 hours community service, and $500 in restitution

- 1:21-CR-00411-APM U.S. v. Matthew Baggott: Defendant pled guilty to one count of 18 U.S.C. § 1752(a)(2). He was sentenced to 3 months incarceration, 12 months supervised release, 60 hours community service, and $500 in restitution

- 1:21-CR-0191-JEB U.S. v. Ryan Zink: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1) and 18 U.S.C. § 1752(a)(2). He was sentenced to 3 months incarceration, 12 months supervised release, 50 hours community service, and $500 in restitution

- 1:23-CR-00114-ACR U.S. v. Ronald Balhorn: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); (b)(1)(A); 18 U.S.C. § 1752(a)(2); (b)(1)(A); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 100 days incarceration, 12 months supervised release,

200 hours community service, $2,000 fine, and $500 in restitution

- ■ 1:23-CR-00114-ACR U.S v. Kyle Mylnarek: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G).  He was sentenced to 100 days incarceration, 12 months supervised release, 200 hours community service, $1,000 fine, and $500 in restitution

- ■ 1:23-CR-00220-TJK U.S. v. Brandon Bradshaw: Defendant pled guilty to one count of 18 U.S.C. § 1752(a)(2).  He was sentenced to 4 months incarceration 12 months supervised release $500 fine, and $500 in restitution

- ■ 1:23-CR-00076-CRC U.S. v. Brandon Kelly Dillard: Defendant was convicted of one count of 18 U.S.C. § 1752(a)(2).  He was sentenced to 4 months incarceration, 12 months supervised release, and $500 in restitution. flew from Las Vegas to the District of Columbia. On January 5, he confronted lines of officers at the National Mall, pointed at the officers, and encouraged the crowd to advance toward the police line by shouting "forward!"  On January 6, he attended President Trump's rally and participated in the riot at the Capitol.  He scaled the exterior wall from the Upper West Terrace area to the window frame of a Senate conference room.  He climbed down to the bottom ledge of the window frame, crouched down, and peered into a portion of a window that had been smashed, shattered, and hollowed out by other rioters.  He then climbed through the window and entered the Capitol building. He crawled back out the window and onto the staging area constructed for the presidential inauguration.  He was feet away from the entrance of the Lower West Tunnel where rioters were violently attacking and assaulting police officers.  Rioters dragged an MPD officer from the line and assaulted him; Dillard repeatedly grabbed the officer's helmet and tried to remove it.

- 1:21-CR-00047-RDM U.S. v. Hector Vargas-Santos: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 4 months incarceration, 12 months supervised release, a $2,500 fine and $500 in restitution

- 1:21-CR-00719-JEB U.S. v. Cynthia Ballenger: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). She was sentenced to 4 months incarceration, 9 months supervised release, and $500 in restitution

- 1:21-CR-00687-RC U.S. v. David Rhine: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 4 months incarceration, 12 months supervised release, 60 hours community service, and a $7,376 fine

- 1:21-CR-00350-DLF U.S. v. Antionne Brodnax: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(E). The Defendant received a sentence of 5 months incarceration, 12 months of supervised release, and a $500 in restitution

- 1:21-CR-00725-MAU U.S. v. Jared Samuel Kastner: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 5 months incarceration and 12 months supervised release

- 1:21-CR-00134-CJN U.S. v. Mark Sahady: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 5 months incarceration, 12 months supervised

release, 60 hours community service, and a $2,000 fine

- 1:22-CR-00409-APM U.S. v. Eric Clark: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 5 months incarceration, 12 months supervised release, 50 hours community service, and $500 in restitution

- 1:21-CR-00222-TFH U.S. v. George Tanios: Defendant pled guilty to one count each of 18 U.S.C. § 1752(a)(1) and (b)(2); and 18 U.S.C. § 1752(a)(2) and (b)(2). He received a sentence of 5 months and 6 days incarceration (Time Served), 12 months supervised release, 100 hours of community service, $500 fine, and $500 in restitution.

- 1:22-CR-00121-TNM U.S. v. Jared Cantrell: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2) and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 6 months incarceration, 12 months supervised release, 4 months home incarceration, 100 hour' community service, $8,000 fine, and $500 in restitution

- 1:21-CR-00503-RCL U.S. v. Glenn Allen Brooks: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 6 months incarceration, 12 months supervised release, 60 hours community service, a $2,000 fine, and $500 in restitution

- 1:24-CR-0083-DLF U.S. v. Patrick Woehl: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 6 months incarceration, 12 months supervised release, 50 hours community service, and $500 in restitution

- 1:21-CR-00244-CKK U.S. v. Anthony Griffith: Defendant plead guilty to one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40

U.S.C. § 5104(e)(2)(G). He was sentenced to 6 months incarceration, 12 months supervised release, and $500 in restitution

- 1:21-CR-00381-TSC U.S. v. Stacey Wade Hager: Defendant plead guilty to one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). She was sentenced to 7 months incarceration and $500 in restitution

- 1:23-CR-00300-DLF U.S. v. Raymond Chambers, II: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 7 months incarceration, 12 months supervised release, and $500 in restitution

- 1:22-CR-00297-TJK U.S. v. Joshua Knowles: Defendant plead guilty to one count of 18 U.S.C. § 1752(a)(2). He was sentenced to 7 months incarceration, 12 months supervised release, and $500 in restitution

- 1:21-CR-00421-JDB U.S. v. John Nassif: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 7 months incarceration 12 months supervised release, $1,000 fine, and $500 in restitution

- 1:21-CR-00274-RDM U.S. v. Johnny Harris: Defendant plead guilty to one count of 18 U.S.C. § 1752(a)(2). He was sentenced to 7 months incarceration 12 months supervised release and $500 in restitution

- 1:21-CR-00346-BAH: U.S. v. Glen Mitchell Simon: Defendant pled guilty to one count 18 U.S.C. § 1752(a)(2). He received 8 months incarceration, 12 months supervised release, $1,000 fine, and $500 in restitution.

- 1:22-CR-00339-RDM U.S. v. Eric Cramer: Defendant was convicted of one count of 18 U.S.C. § 1752(a)(2). He was sentenced to 8 months incarceration, 12 months supervised release and $500 in restitution

- 1:21-CR-00060-CKK U.S. v. Jesus Rivera: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 8 months incarceration, 12 months supervised release and $500 in restitution.

- 1:22-cr-233-ABJ U.S. v. Dylan Cronin: Defendant plead guilty to one count each of 18 U.S.C. § 1752(a)(1) and the lesser included charge of 18 U.S.C. § 1361. He was sentenced to 8 months incarceration, followed by 12 months supervised release, 200 hours community service, and $500 in restitution. Dylan Cronin participated in the first breach of the Capitol at the Senate Wing Door. He sprayed a fire extinguisher at police. He kicked the exterior of the Senate Wing Door and used a piece of lumber to break a windowpane. He was the thirteenth rioter to enter the Capitol, subsequently reentered the Capitol multiple times, and went into the U.S. Senate side, the U.S. House of Representatives side, the Crypt, the Memorial Door, and the Statuary Hall. He showed no remorse and gave false statements to the FBI.

- 1:21-CR-00509-TSC U.S. v. Anthony Vo: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 9 months incarceration, 12 months supervised release, and a $1,000 fine

- 1:21-CR-00247-TFH U.S. v. Bradley Weeks: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40

U.S.C. § 5104(e)(2)(G). He was sentenced to 10 months incarceration, 9 months supervised release, $2,000 in restitution and a $500 fine

- 1:22-CR-00183-TSC U.S. v. Lynnwood Nester: Defendant plead guilty to one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 10 months incarceration, 6 months supervised release, $500 fine, and $500 in restitution

- 1:21-CR-00263-TSC U.S. v. Russell Alford: Defendant was convicted of one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentence to 12 months incarceration, 12 months supervised release, and $500 in restitution.

- 1:21-CR-00505-RCL U.S. v. Isaac Yoder: Defendant plead guilty to one count each of 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 12 months incarceration, 12 months supervised release, $1,000 fine, and $500 in restitution

- 1:22-CR-00414-JEB U.S. v. Andrew Johnson: Defendant plead guilty to one count each of 18 U.S.C. §§ 1752(a)(1); 18 U.S.C. §§ 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 12 months incarceration, 12 months supervised release, $2,336 fine, and $500 in restitution

The one case that counsel could locate involving both of the same misdemeanor charges as Mr. Sexton is US v. Rodean.

- 1:21-CR-00057-TNM U.S. v. Nicholas Rodean: Defendant was convicted of one count each of 18 U.S.C. § 1361; 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 18 U.S.C. § 1752(a)(4); 40 U.S.C. § 5104(e)(2)(D); 40 U.S.C. § 5104(e)(2)(F); and 40 U.S.C. §

5104(e)(2)(G). He received a sentence of 60 months of probation, 240 days of home detention and $2,048 in restitution. Mr. Rodean had a bench trial and was found to have smashed two windowpanes of the US Capitol building with a flagpole and metal object. Yet, he received a non-incarceration sentence.

There are three 18 U.S.C. §1361 felony cases, which also are relevant to sentencing disparity. In these felony cases, Defendants received sentences well below Mr. Sexton's calculated guideline range.

- ■ 1:23-cr-00004-APM: US v. Isaiah Farnsworth. Defendant pled guilty to one felony count of a violation of 18 USC §1361. He received a sentence of 3 months incarceration and 36 months of supervised release.

- ■ 1:21-cr-00029-TSC: US v. Hunter Allen Ehmke. Defendant pled guilty to one felony count of a violation of 18 USC §1361. He received a sentence of 4 months incarceration and 36 months of supervised release.

- ■ 1:21-cr-126-BAH: US v. Troy Ebert Faulkner. Defendant pled guilty to one felony count of a violation of 18 USC §1361. He received a sentence of 5 months incarceration, with credit for time served, and 36 months of supervised release.

Out of the approximately 75 cases that counsel located involving the same offenses coupled with other misdemeanors, approximately 31% of the cases received a non-incarceration sentence. Another 36% received sentences of incarceration of less than half of the bottom of Mr. Sexton's currently calculated guideline. Another approximately 19% were below guideline sentences. Only 10 of the cases, approximately 14% had sentences imposed with the currently calculated guideline range.



Previous sentences imposed on other defendants who plead guilty to the same offense support a non-custodial sentence to ensure uniformity in sentencing. Cases in which incarceration was given for the same offense as Mr. Sexton involve substantially different conduct than that of Mr. Sexton. Specifically, as to the 10 cases that received guideline range sentences, the defendants conduct was much more egregious than Mr. Sexton's often involving direct contact with Law Enforcement, movement deep into the Capitol and remaining in the Capitol for long periods of time, close in time to the beginning of the riots.

■ 1:21-CR-00346-BAH: US v. Glen Mitchell Simon. As to Defendant Simon, this defendant (1) arrived at the Capitol prepared for violence by wearing a plated vest; (2) along with his fellow rioters, pushed a bicycle rack against a line of officers, making physical contact with them and pushing them back; (3) mocked police officers as they attempted to defend the Capitol Building and loudly urged his fellow rioters to put "fear" into the officers; (4) sought out Members of Congress while he was inside the Capitol and urged his fellow rioters to do the same; (5) stayed inside the Capitol for over one hour; (6) actively resisted police officers' efforts to clear the Rotunda; (7) vaingloriously celebrated the riot when interviewed by a

local newspaper reporter a week afterwards; (8) lied to the FBI about the extent of his participation in the events of January 6, 2021; and (9) has a conviction for disorderly conduct/fighting.

■ 1:22-CR-00339-RDM: US v. Eric Cramer: As to Defendant Cramer, (1) the defendant prepared for violence by bringing a facemask (with a respirator) and a baseball bat to the Capitol; (2) he grabbed an officer's baton on the Lower West Terrace when a group of officers were attempting to make their way through the mob and only relinquished his grip after another officer intervened in the struggle; (3) he grabbed an officer's arm on the Lower West Terrace as the officer was being pushed and pulled in different directions by rioters and officers; (4) he was on the front lines of the second breach of the Senate Wing door at approximately 2:45 p.m.; (5) he took a police baton home; (6) he posted a picture of the baton on Facebook after the riot and captioned it, "took it from the cop that hit me with it…so I guess that's my trophy"; (7) did not tell the truth when questioned by law enforcement agents about his conduct shortly after January 6, 2021; and (8) has not yet expressed remorse for his actions.

■ 1:21-CR-00060-CKK: US v. Jesus Rivera: As to Defendant Rivera, the defendant (1) filmed the assault on the police at the Lower West Terrace as they attempted to hold off rioters who were trying to get to the Upper West Terrace, and continued filming the assault on police as their line gave way; (2) encouraged rioters climbing the walls to the Upper West Terrace, yelling to them that "there's an easier way up!"; (3) made a concerted effort to go to the front of the mob that was trying to breach the Senate Wing Door; (4) watched rioters breach the Parliamentarian Door; (5) entered the Capitol through a broken window adjacent to the Senate Wing Door; (6) spent 20 minutes inside the Capitol going, as he had previously stated

he would, to the "middle" by entering the Crypt; (7) live-streamed the riot and urged his followers to share his broadcast, as he celebrated the riot and the destruction of property as it was on-going; and (8) in the days after the riot, not only demonstrated no remorse or contrition for his acts, but instead mocked the pain and trauma suffered by victims and celebrated his participation in the riot in public posts on his social media accounts.

- 1:22-CR-233-ABJ US v. Dylan Cronin: As to Defendant Cronin, Cronin (1) was near the front of the barricade line on the Upper West Plaza where he witnessed violence between other rioters and police officers, including various assaults, deployment of tear gas, chemical spray, and fire extinguishers, and the detonation of a flashbang, but nonetheless joined a mob of hundreds who advanced forward to enter the Capitol building; (2) sprayed a fire extinguisher at police on the Upper West Plaza; (3) assisted in the first breach of the Capitol building by kicking at the Senate Wing Door from the outside and then by using a piece of lumber to break a window pane ; (4) was the thirteenth rioter to enter the Capitol building; (5) traveled to several different locations at the Capitol; (6) joined and encouraged other rioters to join the surge of rioters toward the House Chamber; (7) entered the Capitol building three different occasions, twice through the Senate Wing Door, and once through the Upper House Door; and (8) did not leave voluntarily, but rather stayed inside until he and other rioters were forced out of the building.

- 1:22-CR-00414-JEB US v. Andrew Johnson: As to Defendant Johnson, Johnson (1) climbed over broken glass to enter the U.S. Capitol Building through an office window that had been smashed out; (2) encouraged other rioters to join him in the office; (3) engaged in disorderly and disruptive conduct on U.S. Capitol grounds for over 4 hours until he was appended by police for violating curfew; (4) prolifically spread false information about

January 6, 2021 on social media after the riot; (5) called for a second January 6 over a year after his arrest; (6) showed neither meaningful candor nor remorse; (7) violated his conditions of release on at least ten separate occasions; and (8) has a long criminal history.

- 1:21-CR-00509-TSC US v. Anthony Vo: Defendant Vo was tried and convicted of four misdemeanors.  He violated the conditions of his pretrial release by attending a rally outside the Washington, D.C. jail in support of January 6 defendants.  He called himself a "J6 wrongful convict" and insulted this Court by calling it a "kangaroo court." The Government argued that he refused to accept responsibility for his crimes on January 6, and continued to use social media to publicly dispute his guilt and the findings of the Court.

- 1:21-CR-00247 TFH US v. Weeks: Mr. Weeks wrote about his intention to bring firearms to Washington, D.C.  He arrived on Capitol grounds before 2:00 p.m. and gave a speech on the Northwest Stairs celebrating his ascent and declaring, "This is where Tyranny will fall!" He entered the Senate Wing door and walked further into the Capitol by going into the Crypt and the Hall of Columns.

- 1:22-CR-00183-TSC US v. Nester: Lynnwood Nester was tried and convicted of four misdemeanors.  He stormed the Capitol as part of a violent mob that overran police defenses at three locations.  He surrounded officers guarding the Rotunda Door and refused to leave as other rioters assaulted police and forced open the door.  He falsely testified at trial that he believed he had a right to enter the Capitol and that police allowed him to enter.

- 1:21-CR-00505-RCL US v. Yoder: Isaac Yoder was tried and convicted of four misdemeanors.  He entered the Capitol wearing Revolutionary War attire, including a sword in a scabbard and a flag on a pole.  He went through the Senate Wing Door despite a blaring alarm.  He posed for pictures with other rioters throughout the day.

- 1:21-CR-00263-TSC US v. Alford: Defendant Alford was tried and convicted of four misdemeanors. He refused to leave the Capitol after police ordered him and other rioters to leave. He pounded on a door that led to the floor of the House, behind which dozens of Congress members were sheltering.

Additionally, there are many cases involving convictions for other misdemeanor statutes, that involve comparable or arguably worse conduct, many of which also received a non-incarceration sentence.

- Jenny Louise Cudd spent more than 20 minutes inside the Capitol. The day before, she posted a bellicose video to social media declaring "either our side or the other side is going to start a revolution." On January 6, Cudd dressed in a bulletproof sweatshirt, and at 12:30 p.m, she posted a live video stating she was wearing that sweatshirt and intended to assemble with the Proud Boys at the Capitol. She crossed overturned bike racks, climbed a wall to reach the Capitol, and pushed against police officers yelling "go" and "charge." She entered the Capitol through the Upper West Terrace Door and paraded through the Rotunda, the Statuary Hall, the East Stairs, and the Main Door Hall before exiting near the Upper House Door. Afterwards, she remained on the Capitol grounds for approximately an hour and twenty minutes and posted a 25-minute video celebrating her participation and property destruction, including "pushing and pushing and pushing" against police and "break[ing] down the Nancy Pelosi's office door." Cudd never demonstrated remorse for her conduct; she indicated she would participate in another January 6-like event. Cudd pled guilty to a misdemeanor, 18 U.S.C. § 1752(a)(1), and was sentenced to two months probation, a $5,000 fine, and $500 in restitution. Case No. 1:21-cr-00068-TNM-1.

- Dana Joe Winn remained in the Capitol for approximately 35 minutes. He is a Navy veteran

who traveled from Florida to the District of Columbia. During the trip, Winn stated his companion had a "flagpole, that way I can hit Antifa in the head if need be." He crossed over barricades and entered the Capitol shortly after it was breached. He carried a flagpole and paraded through the Rotunda and Statuary Hall, among other areas. After exiting, he remained on the steps bragging about having been inside the building and having been tear-gassed by police. He pled guilty to a misdemeanor, 18 U.S.C. § 1752(a)(1), and was sentenced to twelve months probation and $500 in restitution. Case No. 1:21-cr-00139-TNM-2.

■ Rachael Lynn Pert (Winn's codefendant) remained in the Capitol for approximately 35 minutes. She is a Navy veteran who traveled from Florida to the District of Columbia. She crossed over barricades and entered the Capitol shortly after it was breached. She paraded through the Rotunda and Statuary Hall, among other areas. After exiting, she remained on the steps bragging about being inside the building and being tear-gassed by police. She pled guilty to a misdemeanor, 18 U.S.C. § 1752(a)(1), and was sentenced to 24 months probation and $500 in restitution. Case No. 1:21-cr-00139-TNM-1.

■ David Ball traveled from Maine to the District of Columbia to attend President Trump's "Stop the Steal" rally. He went to the Capitol and trespassed through the fenced-off perimeter. He was dressed in all-black clothing and carrying a flag with a skull-and-crossbones type logo: the 'crossbones' were short-barreled shotguns, and the banner was emblazoned "2ND AMENDMENT–1789–AMERICA'S ORIGINAL HOMELAND SECURITY." He saw rioters fighting police and then climbed the Northwest Stairs. He entered the Capitol Building through the Senate Wing Door minutes after it was breached at 2:20 p.m. He saw shattered glass and walked toward the Crypt where he joined and went

to the front of a loud, belligerent crowd that began pressing against a thin line of police officers. He pumped his fist in the air while holding his flag. He and other rioters surged against the line of officers, overwhelming and pushing them out the way. He remained in the Crypt and adjoining hallways for over ten minutes, all while photographing and videorecording his activities. After January 6, Ball attempted to downplay his unjustifiable actions. In October 2023, Ball pled guilty to one misdemeanor, 40 U.S.C. § 5104(e)(2)(G). He was sentenced to 24 months probation, a $500 fine, and $500 in restitution. Case No. 1:23-cr-00153-JDB.

- Annie Howell prepared for January 6 by discussing plans for bail, the acquisition of tear gas, and meeting with members of the Proud Boys. She attended President Trump's rally on the morning of January 6, returned to her hotel, and then went to the Capitol after learning a belligerent crowd had assembled there. Howell watched other rioters engage in violence with police—including chanting "whose house, our house" and recording at least five videos celebrating the siege at the tunnel entrance to the Lower West Terrace where rioters hit and kicked at police—before she entered the Capitol through a broken window. She entered a room filled with overturned furniture. She exited through the same window she had entered. She stayed on the Capitol grounds videorecording and watching the rioters engage with police. Howell made social media posts during and after the riot mischaracterizing the riot and showing a lack of remorse. She wrongfully blamed police for the violence on January 6. Howell pled guilty to a misdemeanor, 18 U.S.C. § 1752(a)(1), and was sentenced to three years probation and $500 in restitution. Case No. 1:21-cr-00217-TFH.

- Darrell Youngers scaled a wall, filmed a confrontation between rioters and police, and entered the Senate Wing Doors less than ten minutes after the initial breach. He declared

"this is what a revolution mother***ing looks like" and collected a souvenir piece of broken glass. He yelled, "We are inside the Capitol Building. It has been overrun. The Capitol Building has literally been broken into." He swatted at a police officer, encouraged other rioters, and filmed another video celebrating the Capitol breach. He pled guilty to a misdemeanor—40 U.S.C. § 5104(e)(2)(G)—and was sentenced to 36 months probation, a $1000 fine, and $500 in restitution. Case No. 1:21-cr-00640-TFH-2.

- Cara Hentschel was on probation for felony offenses when she traveled from Missouri to the District of Columbia to participate in the January 6 riot at the Capitol. She entered the Capitol Building through the Rotunda Doors minutes after the violent breach during which rioters assaulted police officers and smashed glass paneling on the doors. This breach was one of the most consequential on January 6 because it allowed hundreds of rioters to enter the Capitol; rioters sprayed chemical irritants and struck at officers with flagpoles and other items; Hentschel was nearby and aware of all this mayhem. Minutes before entering, she made social media posts celebrating and encouraging the riot (including a Facebook post captioned "Storming the Capitol" depicting her on the stairs); afterwards, she boasted on social media about her involvement in the riot—including an Instagram post captioned "I got f***ing mased"—and attempted to justify it. She did not express remorse for her involvement. Hentschel had an extensive criminal history including three felony drug convictions and eleven misdemeanor convictions. As noted, she was on felony probation when she participated in the riot. Hentschel pled guilty to one misdemeanor, 40 U.S.C. § 5104(e)(2)(G), and was sentenced to 36 months probation, a $500 fine, and $500 in restitution. Case No. 1:21-cr-00667-RCL-1.

- Elliot Bishai, a South Carolina resident like Mr. Sexton, drove with two friends from South

Carolina to the District of Columbia.  He attended the "Stop the Steal" rally and then walked towards the Capitol, seeing broken fencing and scattered bicycle barricades.  He marched onward despite encountering tear gas and witnessing police lines attempting to block the crowd.  He filmed himself encouraging other rioters to "keep pushing" while they ascended the Northwest stairs and shouted "go, come on, you got it" and "let's go, Civil War 2" to rioters scaling a wall.  He entered the Capitol Building through a broken window that had been shattered by other rioters, stepping over shattered glass.  He entered and remained inside a U.S. Senate conference room (a sensitive area) while sitting in a chair.  Bishai spent 27 minutes inside the Capitol.  Notably, he was a member of the United States Civilian Air Patrol, a federally funded public entity.  Bishai pled guilty to a misdemeanor, 18 U.S.C. § 1752(a)(1), and was sentenced to 14 days incarceration and 12 months supervised release.  Case No. 1:21-cr-00282-TSC-2.

- Bradley Rukstales traveled from Illinois to the District of Columbia.  He arrived at the Capitol Building after rioters had breached the Crypt.  Some rioters threw chairs at police officers who were retreating down a stairwell; Rukstales descended the stairwell seconds after the officers' retreat.  He picked up one of the chairs at the base of the stairs and flung it in the direction of the officers.  He walked to the end of the corridor where other rioters had gathered at the police line.  The rioters refused to leave despite officers' commands, so officers began arresting people including Rukstales.  A brawl ensued with rioters resisting arrest.  At one point, an officer brushed against Rukstales, and Rukstales stretched his arm out toward the officer.  The officer immediately grabbed Rukstales and brought him to the ground.  Another rioter attempted to pull Rukstales away from the officer, so a second officer came and brushed away the rioter.  Ultimately, three officers were necessary to

subdue Rukstales, and they dragged him behind the police line to be fully subdued and arrested.  Rukstales subsequently posted a Twitter apology for his actions on January 6.  He pled guilty to one misdemeanor, 40 U.S.C. § 5104(e)(2)(G), and was sentenced to 30 days incarceration and $500 in restitution.  Case No. 1:21-cr-00041-CJN-5.

■ William Kit promoted conspiracy theories about the 2020 election on his YouTube and Instagram accounts (both of which have thousands of followers), claiming the election had been stolen from President Trump.  He livestreamed himself traveling to the Ellipse and listening to President Trump's "Save America" speech.  He then walked to the Capitol grounds and entered the West Plaza.  He approached a line of metal bike racks being defended by police officers and walked to the front of the crowd of belligerent rioters.  He angrily shouted at police and raised his middle finger yelling, "F*** you, Nancy Pelosi!" Rioters near Kit began pushing the bike rack barricade and fighting officers.  Police deployed OC spray, causing Kit to back away, but he then returned to the front of the crowd aggressively yelling and angrily gesturing at police.  Kit followed a crowd towards the scaffolding atop the Northwest Staircase, pumping his fists in the air and waving for others to follow him.  He reached the Northwest Terrace and remained there for 30 minutes while livestreaming himself yelling at police (including, among other profane statements, "Are you willing to f***ing die for this s***?  We are here to die for this s*** today!").  He entered the Capitol through the Senate Wing Door—still livestreaming and asking, "Where are those godd*** politicians at?!"—and walked toward the Crypt before climbing out a broken window.  He showed no remorse for his actions.  When FBI agents executed a warrant for his arrest, Kit fled from them and discarded a handgun that had been stolen from a firearms dealer in Maryland.  Kit pled guilty to one misdemeanor, 18 U.S.C. § 1752(a)(1),

and was sentenced to 30 days incarceration, one year of supervised release, and $500 in restitution. Case No. 1:22-cr-00306-JMC-1.

■ Ryan Kelley was with the group of rioters that breached the scaffolding beside the Northwest stairs shortly after 1:30 p.m. He saw flash bang grenades, chemical irritants, and human blood on the stairs but persisted in the Capitol breach. He encouraged and helped other rioters, and he damaged property by ripping apart a large protective tarp covering the scaffolding beside the Northwest stairs. He handled a metal bike rack and helped push it towards rioters closer to the police. Kelley photographed and videorecorded rioters rushing and attacking police officers. He spent almost two hours on the restricted Capitol grounds and failed to express remorse. In July 2023, Kelley pled guilty to a misdemeanor, 18 U.S.C. § 1752(a)(1), and in November 2023 he was sentenced to 60 days imprisonment, one year of supervised release, a $5,000 fine, and $500 in restitution. Case No. 1:22-cr-00222-CRC.

■ Matthew Baggot (Parks' codefendant) entered the Capitol during the breach of the Senate Wing Doors; he was part of the first wave of rioters to do so. He was present while other rioters broke windows leading to this initial breach. He participated in violent behavior by throwing an object at police officers, and he grabbed at an officer's baton as he was being removed from the building. He was close to rioters who were pulling away a barricade from police officers, spraying chemical irritants at the police, and jabbing flagpoles at police. He followed a crowd that chased a police officer from the first to the second floor of the Capitol. Baggot remained in the Capitol building for over 40 minutes, going throughout various parts of it. He pled guilty to one misdemeanor, 18 U.S.C. § 1752(a)(2), and was sentenced to three months incarceration. Case No. 1:21-cr-00411-APM-2.

■ Kasey Hopkins discussed traveling to the District of Columbia three days before going

there, agreeing civil war was a possibility and proposing to form a group called "Proud Felons For Trump." He entered, exited, and reentered the Capitol, parading through the Senate Parliamentarian's Office, the Senate Wing, the private hideaway office of Senator Jeffrey Merkley, and the Crypt. He recorded the events on his phone, including his entry into the Senate Parliamentarian's Office. After finally exiting, Hopkins stayed on the Capitol Grounds until after 4:00 p.m. Hopkins had a significant criminal history, including convictions for forcible rape, multiple assaults (including one on a law enforcement officer), non-support, possession of a controlled substance; he also completed a 12-month diversionary program for a domestic assault charge. Hopkins pled guilty to one misdemeanor, 40 U.S.C. § 5104(e)(2)(G), and was sentenced to four months incarceration, two years' probation, and $500 in restitution. Case No. 1:22-cr-00317-TSC.

■ Stewart Parks  entered the Capitol and paraded through it for over 45 minutes. He arrived on the Capitol grounds and worked his way to the front of the crowd being held back by a line of police officers. Rioters overran the officers, and Parks went inside the scaffolding providing access to the Upper West Terrace. He watched other rioters smash open windows just feet away from him. He entered through the Senate Wing Door twelve seconds after it was kicked open at 2:13 p.m.; this entrance occurred before the House and Senate adjourned proceedings due to the riot. Parks watched other rioters assault officers, and he documented his presence in multiple posts to social media. He went through the Ohio Clock Corridor, the Will Rogers Hallway, and other areas while also stealing a metal detector hand wand belonging to U.S. Capitol Police. Parks proceeded to trial and was convicted of five misdemeanor charges, including theft of government property. Parks gave false testimony and received a sentencing enhancement for obstruction of justice. He was sentenced to eight

months incarceration.  Case No. 1:21-cr-00411-APM-1.

Mr. Sexton urges the Court to compare the above cases to Mr. Sexton's case. Mr. Sexton entered the Capitol Building through a broken window and broke an end table leg. However, Mr. Sexton did not threaten, assault, or engage with law enforcement officers (unlike many of the defendants above).  He was in an anteroom for a matter of minutes, and unlike others who proceeded much deeper into the Capitol, he never left this room, and exited the Building and the Capitol grounds, taking the table leg with him as a souvenir.  A sentence of probation would be consistent with the nature and circumstances of the offense, and the history and characteristics of the defendant.

Mr. Sexton asks this Court to consider not only the above cases but also his timely guilty plea in deciding the sentence to impose.  A court may "extend a proper degree of leniency in return for [a] guilty plea[]."  United States v. Otunyo, 63 F.4th 948, 960 (D.C. Cir. 2023) (quoting Corbitt v. New Jersey, 439 U.S. 212, 223 (1978)).  A court can show more leniency to a defendant who shows "acceptance of responsibility by acknowledging his guilt at an earlier stage" of the proceeding. Id. "[I]t is equally lawful for a court to give a downward variance to a more cooperative defendant while denying the variance to a more litigious defendant."  Id.

## VI.    Need to Provide Restitution

Mr. Sexton has agreed to pay $2,000 restitution pursuant to his plea agreement.  ECF No. 32 at p. 9.  He intends to promptly pay the full amount.

Finally, Mr. Sexton asks that the Court consider the attached letters submitted on Mr. Sexton's behalf. See Exhibit 1.

## CONCLUSION

Mr. Sexton hates his involvement in the Capitol riot.  He takes complete responsibility for

his actions, and he sincerely apologizes for those actions.  He apologizes to the United States Capitol Police Department and the Metropolitan Police Department.  He apologizes to his country. He apologizes to this Court.

Based on all of the reasons discussed herein and the applicable 18 U.S.C. §3553(a) factors; and considering Mr. Sexton's compliance with the conditions of his release both before and after his conviction, and the need to impose a fair sentence when considering similar January 6 cases, Mr. Stephen Sexton respectfully and humbly asks this Court to vary downward from the advisory guideline range contained in his Presentence Report and impose a sentence of probation with whatever additional conditions the Court deems appropriate.

Respectfully submitted,

/s/ Casey P. Riddle,
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite 105
Florence, South Carolina 29501
Telephone: (843) 662-1510
**Attorney ID #: 12315**


/s/ Edmund G.M. Neyle
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite 105
Florence, South Carolina 29501
Telephone: (843) 662-1510
**Attorney ID #: 13832**

Florence, South Carolina

December 9, 2024